**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-118 (DLF)** |
| **v.** | : | |
| | : | |
| **JACOB GARCIA,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jacob Garcia to 60 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Jacob Garcia (hereinafter, "Garcia") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 20, 2022, (ECF No. 20 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Garcia pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 60 days' incarceration is appropriate in this case because (1) Garcia yelled at police officers outside of the Capitol stating, "What y'all scared of"; (2) he scaled the walls outside of the Capitol using repurposed metal fencing; (3) he encouraged rioters to enter the building, stating to rioters on the lower west terrace, "If you're not going, get out" and yelling "get in here" and "come on" to rioters as he entered the Senate Wing Door; (4) Garcia was inside the Capitol for nearly one hour and traveled through the Senate Wing, the Crypt, the House Wing, the Hall of Columns, the Rotunda, upstairs in a Senate office hallway, and then back to the Rotunda and out the Memorial Doors; (5) while inside the Crypt he encouraged the mob to push past police officers, chanting "this is our house," "what we scared of . . . big boys (police officers) up here," and "who's house, our house"; (6) while inside the Rotunda, Garcia directed the mob to move against police officers, yelling, "we need people," "get in here," and "come on" as he directed the mob towards a police line; (7) On January 6 and 7, 2021, Garcia showed no remorse when he posted to Facebook stating, "We literally stormed the capital [*sic*]" and "Americams [*sic*] storm the capital [*sic*] . . . my only regret is not getting some souvenirs . . . Got a dude on film showing he stole a framed picture of Pelosi."; and (8) he continues to post on social media regarding the 2020 election and "stolen" elections.

The Court must also consider that Garcia's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Garcia's crime support a sentence of incarceration in this case. But for his actions alongside so many others, the riot likely would have failed. Here, Garcia's participation in a riot that succeeded in halting the Congressional

certification, his encouragement of the mob to push forward against police, and his lack of remorse make a sentence of incarceration appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20 (Statement of Offense), at ¶¶ 1-7.

### *Defendant Garcia's Role in the January 6, 2021 Attack on the Capitol*

On or before January 6, 2021, Garcia traveled to Washington, D.C., from his home in Cleburne, Texas, to protest Congress' certification of the Electoral College vote.

On January 6, 2021, between 1:30 p.m. and 2:17 p.m., Garcia was part of the mob that advanced past the restricted perimeter towards the western side of Capitol.  Portions of Garcia's day were captured on a Go-Pro camera (Exhibit 1 and 2) he had affixed to his chest.  Garcia posted his footage to Facebook which was retrieved by agents through a search warrant.



*View from Garcia's Go-Pro as he approached the Capitol (Exhibit 1)*

As Garcia approached the Capitol he can be heard on his Go-Pro stating "lets get inside," "if you're going to stop us, get out of the way," and "if you're not going, get out," referring to members of the crowd who were not moving towards the Capitol.  Garcia is seen weaving through

the crowd, yelling "lets go, lets go," hopping over short stone walls, and climbing over larger walls with the assistance of metal fencing and other rioters.



*Two stills from Garcia's Go-Pro of rioters climbing a wall on Capitol Grounds (Exhibit 1)*

Upon climbing the wall depicted in the images above, Garcia yelled "Yeah," turned back at the sea of people and yelled "This is America" and he chanted "USA, USA."  Garcia then continued his march towards the Capitol by walking on top of that wall/handrail.



*Garcia's Go-Pro showing him walking on the wall/railing (Exhibit 1)*

Garcia continued on the wall/handrailing and again turned to the crowd to yell, "This is America" and "Yeah"!  Garcia then made it to the lower west terrace outside the Senate Wing Door.  He then yelled multiple times, "What are y'all scared of" to members of the mob, encouraging them to enter the Capitol.  As he walked up the ramp to the Senate Wing Door, he yelled to other rioters "Come on, lets go" and what sounds like "We not scared now."  At 2:17

p.m., his Go-Pro then recorded him as he entered the Senate Wing Door and he stated, "This is our house."



*CCTV footage of Garcia entering as he states "This is our house"*

Garcia then proceeded into the Crypt and chanted, "Who's house, our house." After entering the Crypt, he saw the crowd was not moving due to a line of police officers.  Garcia then yelled, "What are we scared of" and "let's go" encouraging the mob to push forward against a line of police officers.  Garcia then moved towards the front of the line and yelled, "they scared," referring to a line of police officers standing just feet away from the mob.



*View from Garcia's Go-Pro as he yells to other rioters, "they scared" (Exhibit 1)*

Garcia then weaved his way around the officers and encountered another line of police officers guarding a hallway off the Crypt. As he approached these officers, he yelled, "Look at them, look at them boys . . . we coming through boys, we coming through today boys." Garcia's Go-Pro then went dark as he was packed in close with the police officers and other rioters. Garcia can be heard yelling in the Exhibit 1 footage, "Push, push." Garcia and the mob made it past the police officers and Garcia stated, "We getting through." Garcia then paraded down the House wing hallway and into the Hall of Columns. There he was rebuffed by a line of officers, and he returned down the House wing hallway and into the Rotunda.

In the Rotunda, Garcia fist-bumped rioters and tear gas can be heard going off and smoke can be seen in the Rotunda in the Exhibit 1 footage. As Garcia walked around the Rotunda, he was told by a rioter that the police, "Oathbreakers" according to the rioter, are preventing the mob "from pushing forward." Garcia's reaction was to turn around and yell, "come on everybody," and "come on," encouraging rioters to move towards the police line.

Garcia then moved through the doorway, up a flight of stairs, and proceeded down a Senate office hallway. During his walk up the stairs and down the Senate office hallway, Garcia checked the handles of several closed doors to see if he could get inside.



*CCTV footage of Garcia proceeding down a hallway of Senate offices.*



*Two images from Garcia's Go-Pro showing him grabbing doors (Exhibit 1)*

Garcia then returned back to the Rotunda and waived in rioters into the area from which he just returned.  As he exited, he yelled "everybody come on," "we need people," "get the fuck in there."  Garcia then high-fived rioters as they heeded his commands to flood into the hallway.



*Garcia high-fiving rioters as they follow his commands*

At 2:57 p.m., Garcia then proceeded toward the Memorial Doors, which lead outside of the Capitol, but instead of exiting, he turned around and returned to the Rotunda.



*Garcia steps from leaving the Capitol before he turned around*

Garcia then returned to the Rotunda where he walked around for a few minutes before a line of police officers began moving the crowd out of the building.  At 3:11 p.m.,[2] Garcia exited the Capitol through the Memorial Doors.

*Garcia's Social Media*

Garcia posted to and interacted regularly on social media before, during, and after January 6, 2021.  A Facebook search warrant return for Garcia's account showed a number of election-related liked media before January 6, 2021, indicating that Garcia falsely believed the 2020 election was stolen and planned to go to D.C. to do whatever he could to overturn the election. For example, on December 14, 2020, Garcia linked a tweet from twitter user @disclosetv:

---

[2] The presentence investigation report incorrectly notes Garcia left the Capitol at 4:15 p.m. ECF 21 at ¶ 18. The Statement of Offence correctly notes the time Garcia left the Capitol as approximately 3:15 p.m. ECF 20 at ¶ 10.



On December 21, 2020, Garcia posted a video to Facebook which discussed being "Red pilled," referring to individuals who can understand the true nature of things. The defendant titled the post, "Get ready DC" and the post had the words, "It's Time To Rise the Fuck Up!" Garcia's social media posts after the riot showed that he had no remorse after the fact, and his only regret was not engaging in additional criminal activity. For instance, on January 6, 2021, Garcia posted on Facebook, "We literally stormed the capital [*sic*]." The same day, Garcia posted several videos from his Go-Pro to Facebook which depicted his time outside and inside the Capitol.[3] The following day, he posted to Facebook, "Americams [*sic*] storm the capital [*sic*] . . . my only regret is not getting some souvenirs . . . Got a dude on film showing he stole a framed picture of Pelosi."

During Garcia's pre-sentencing interview with probation, he stated that he now uses a Truth Social account, @JustJacob_. Garcia continued to post about the 2020 election, how the

---

[3] Two of these videos are being provided as Exhibit 1 and 2. When agents went to view Garcia's Facebook, these videos were not present. It is unclear if Garcia deleted the videos or made them private.

2022 mid-term elections would be stolen, and that "chaos" that would happen when the 2022 mid-term elections were stolen:





*Defendant's Interview*

On March 21, 2022, Garcia gave a post-arrest interview to the FBI. During the interview, Garcia claimed he could not understand his rights. Agents read him his rights off a *Miranda* warning form and Garcia said, "this paper does not give me any rights." Agents told him he did not have to talk to them, but he did need to understand his rights before they could talk. Garcia said he could read, but that he could not understand the rights. Agents requested consent to search his cellphone and Garcia denied consent. After twelve minutes, agents terminated the interview.

As he was leaving the interview, Garcia said "lots going on right now . . . we are on the cusp of a whole new world."

*The Charges and Plea Agreement*

On March 7, 2022, the United States charged Garcia by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On March 18, 2022, law enforcement officers arrested Garcia in Fort Worth, Texas. On April 4, 2022, the United States charged Garcia by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 20, 2022, pursuant to a plea agreement, Garcia pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Garcia now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days' incarceration and 36 months of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Garcia's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Garcia, the absence of violent or destructive acts is not a mitigating factor. Had Garcia engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors for Garcia is his continued encouragement of the mob, both outside and inside the Capitol.  Outside the Capitol, Garcia yelled, "If you're not going, get out" and "let's go" to encourage members of the mob to either move into the Capitol or move out of the way.  Garcia also participated in a number of chants outside the Capitol.  For example, he yelled, "This is America!" and he yelled at members of the mob "What y'all scared of," encouraging them to breach the Capitol's doors.  As Garcia entered the Capitol, he yelled "This is our house."  As Garcia stormed through the Capitol, he continued to berate police officers and encourage the mob.  For example, in the Crypt he yelled, "What we scared of . . . big boys up

here," referring to the police officers holding back the mob.  Garcia continued to encourage the mob later in the Rotunda when he yelled to the mob that "we need people" to overwhelm the police and "get in here . . . come on."  Garcia encouraged the mob to push forward and challenge police throughout his time inside and outside of the Capitol.

Garcia was also in the Capitol for almost one hour.  He traveled to multiple locations including the Senate Wing Door, the Crypt, the House Wing, the Hall of Columns, the Rotunda, upstairs in a Senate office hallway, and then back to the Rotunda and out the Memorial Doors.  He tried to make his way further and further into the Capitol, trying different corridors, and attempting to open doors to Senate offices.  At 2:57 p.m., Garcia was feet away from exiting the Capitol and moving in that direction; however, he turned around and continued back into the Capitol for almost fifteen more minutes.  This shows Garcia's time in the Capitol and the number of places he visited were not because he was lost and looking for an exit.  It was because he wanted to be inside, disrupting Congress.  It was only after a line of officers formed in the Rotunda that Garcia decided he should leave.  Garcia's long time in the Capitol, the number of locations he visited, and his attempts to open office doors shows his intent that day and warrant a sentence of incarceration.

To date, Garcia has expressed no remorse for his criminal conduct, only regret that he was arrested for it.  On January 7, 2021, Garcia lamented on Facebook that "my only regret is not getting some souvenirs."  Garcia's only regret is that he did not get to steal items from members of Congress and the Capitol.  Garcia's state of mind in the days after he stormed the Capitol was giddiness at having stormed the Capitol and shamelessness towards his egregious behavior on January 6, 2021 – the opposite of regret.  His only regret was that his conduct was not more egregious.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Garcia.

As set forth in the PSR, Garcia's criminal history consists of a conviction in 2015 for possession of less than two ounces of marijuana. ECF 21 at ¶ 26. Garcia pled guilty and the case was deferred for six months before the court dismissed his probation.  *Id*.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Garcia participated in the riot on January 6, despite watching rioters push past police and seeing the destruction of property around him. He then actively encouraged the mob, both inside and outside the Capitol, to push forward past police officers. Garcia then celebrated his participation in the riot, saying his only regret was not stealing items from the Capitol. More than a year later, he is still active on social media, falling prey to conspiracy theories about elections

and ominously predicting "chaos," similar to the way he posted "Get ready DC" in the weeks before January 6.  A sentence of incarceration is warranted to underscore that Garcia's conduct was criminal, and to deter him from engaging in such lawless conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Garcia based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Garcia has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24

("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Clifford Meteer*, 21-cr-630 (CJN), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Meteer followed the mob that overran police officers on the Upper West Terrace and entered the Capitol through the Senate Wing Door at 2:24 p.m. Gov. Sentencing Memo., *Meteer*, 21-cr-630 (CJN), ECF 31 at 2.  He was inside the Capitol for 31 minutes and paraded through multiple areas, including the Crypt.  *Id.* After January 6, 2021, he made statements in interviews and posted statements on social media that showed a lack of remorse.  *Id.* When interviewed by agents, he refused to admit he was inside the Capitol. *Id.* Meteer was previously convicted of a felony and several firearms were found in his residence upon execution of a search

warrant. *Id.* The government asked for a sentence of 75 days' incarceration followed by 36 months of probation.  *Id.* at 1. Meteer received a sentence of 60 days' incarceration. *Meteer*, 21-cr-630 (CJN), ECF 31.

Like Meteer, Garcia followed the mob to the Capitol and entered the building through the Senate Wing Door just minutes before Meteer. Garcia was inside the building for a similar length of time and, like Meteer, paraded through multiple areas of the Capitol. Garcia also showed a lack of remorse when he said is only regret was not stealing items from the Capitol. While Meteer was a convicted felon and firearms were seized, Garcia's actions that day were more aggravated: he was in the building almost twice as long as Meteer and he encouraged members of the mob to confront police. Given the similarity of their crimes, Garcia should be sentenced to 60 days' incarceration.

In *United States v. Rafael Valadez*, 21-cr-695 (JEB), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, picking, or demonstrating in the Capitol building). Valadez entered the Capitol through the Senate Wing Door at 2:20 p.m., ten minutes after it was initially breached, he took videos of members of the mob entering the Capitol and within the Capitol, was part of the mob that passed officers in the Crypt, was inside the Capitol for 26 minutes, and did not express remorse for his actions. Gov. Sentencing Memo., *United States v. Rafael Valadez*, 21-cr-695 (JEB), ECF 27 at 2. The government asked for a 30-day sentence followed by 36-months of probation. *Id.* at 1. Valadez received a sentence of 30-days incarceration. *Rafael Valadez*, 21-cr-695 (JEB), ECF 30.

Like Valadez, Garcia entered the Capitol through the Senate Wing Door shortly before Valadez, Garcia took several videos outside and inside the Capitol, and he did not show remorse after January 6. Unlike Valadez, Garcia encouraged members of the mob, waived them through to

different areas to challenge police, and Garcia was in the Capitol twice as long as Valadez. Given the similarities to Valadez and the additional aggravating factors in Garcia's case, Garcia should be sentenced to 60 days' incarceration.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Garcia to 60 days' confinement and 36 months' probation. [5] Such a sentence protects the community, promotes respect for the law, and

---

[5]      Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. *See, e.g.,* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992). In this district, at least two judges have similarly imposed multiple terms of imprisonment consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while

recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:          */s/ Brian Brady*
             Brian Brady
             Trial Attorney, Department of Justice
             DC Bar No. 1674360
             1301 New York Ave. N.W., Suite 800
             Washington, DC 20005
             (202) 834-1916
             Brian.Brady@usdoj.gov